UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

EDWARD J. BRONSON,

Debtor.

Chapter 7

Case No.: 16-23498-rdd

# DECLARATION OF MARANDA FRITZ IN OPPOSITION TO DEBTOR'S ORDER TO SHOW CAUSE

MARANDA E. FRITZ, under penalty of perjury pursuant to 28 U.S.C. § 1746, declares as follows::

1. I am the attorney for Mark Grober and Evan Solomon, have been litigating *Grober v. Bronson*, Index No. 651184/12 pending in the Supreme Court of the State of New York, County of New York ("New York State Court litigation") for more than four years. I am fully familiar with the facts and circumstances of the New York State Court litigation, and provide this information on personal knowledge unless otherwise stated. I provide this Declaration to inform the Trustee and the Court of the pattern of conduct of Edward Bronson that includes concealment of assets, violation of court orders, and cunning manipulations of the litigation process. As discussed below, there appear to be substantial questions concerning the *bona fides* of Mr. Bronson's bankruptcy filing but if this action proceeds, I ask that the Trustee and the Court ensure that the assets of Mr. Bronson are properly marshalled, as opposed to secreted by him and his wife.

# BACKGROUND

## A. The Grober and Solomon Litigation

2. The underlying New York State Court litigation was commenced against Mr. Bronson more than four years ago, in April 2012 on behalf of Mark Grober and Evan Solomon, two former employees of Mr. Bronson at his business, Fairhills Capital. The complaint alleged that, during the period February 2009 through May 2011, Mr. Bronson defrauded both of the plaintiffs by persuading them not to take their substantial compensation and instead to leave those funds in the firm and allow Mr. Bronson to use those funds in his securities transactions and earn a percentage of the profits. Exhibit A: Verified Complaint ¶¶ 2-5. The business generated profits of more than $13 million during that period of their employ and Mr. Bronson continuously drew millions of dollars from the business. As of May of 2011, when the plaintiffs decided to cease working for Mr. Bronson, they were owed a combined total of approximately $2.5 million. The complaint alleges that, consistent with his pattern and practice, Mr. Bronson had never intended to pay them the amounts that were owed and in fact refused to do so. *Id.* ¶¶ 68-72.

3. Based on a series of legal machinations by Mr. Bronson, and as a sanction for his refusal to provide discovery, the Court in November 2013 granted judgment in favor of the plaintiffs on claims of breach of contract and violations of New York's Labor Law and referred the matter to a Special Referee for calculation of damages. A copy of the Court's decision in attached hereto as Exhibit B.

4. An inquest was conducted in May 2014, after which the Special Referee awarded damages to the plaintiffs in the total amount in excess of $2.2 million. A copy of that decision is attached as Exhibit C.

5. The matter continued to drag on in state court as Mr. Bronson filed motions directed to the Referee's findings, used settlement discussions for purposes of delay, and engaged in several changes of counsel.

6. By January 2016, and on the eve of another hearing to confirm the total amount of the judgment, the Defendant purported to settle the matter, executing a settlement agreement providing that he would pay to Plaintiffs a total of $750,000 and immediately transfer to the Plaintiffs certain securities then held by Macallan Partners. After agreeing to that settlement, the Defendant then nonetheless proceeded to liquidate those precise securities so that effort to settle failed. A further settlement was negotiated and, on or about February 12, 2016, the parties executed those agreements. A copy of the Settlement Agreement is attached as Exhibit D.

7. The Defendant apparently never intended to honor that settlement agreement that he executed, making only the requisite initial payment. When the next payment came due, the defendant defaulted, and so the Plaintiffs returned to the Court to seek enforcement of the provision in the settlement agreement that called for entry of judgment.

8. On April 22, 2016, the Court issued a decision and order in favor of Plaintiffs and against Defendant in the sum of $1,398,146.00, together with statutory interest at 9% from April 1, 2016, for Defendant's breach of employment agreement, breech of investment agreement, and violation of New York's Labor Law. A copy of that decision is attached as Exhibit E.

9. The Plaintiffs promptly sought entry of that judgment. On August 15, 2016, the Court entered judgment in favor of Plaintiffs and against Defendant for a total sum of $1,445,031.77. A copy of the judgment is attached as Exhibit F.

B.  **Plaintiff's Efforts To Obtain Satisfaction Of The Judgment**

   1. **Defendant Edward Bronson and Dawn Bronson Ignore and Fail to Comply with Information Requests**

10. Shortly after the entry of judgment in August, Plaintiffs served an information subpoena on defendant and a deposition subpoena on his wife, Dawn Bronson.

11. Responses to those information requests were due on September 12, 2016 and October 18, 2016. Both Edward and Dawn Bronson completely ignored those requests. They neither sought an extension of time nor did they respond.

   2. **Plaintiffs Learn that Defendant Has Emptied or Closed the Bank Accounts That Were Known to the Plaintiffs**

12. Plaintiffs also undertook substantial efforts to locate assets that could be applied to satisfy the judgment that they obtained. For example, Plaintiffs issued subpoenas duces tecum and information subpoenas to several banks that were, throughout the period of the Plaintiffs' employment, and through the time of the one and only settlement payment, used by the Defendant. The Plaintiffs learned that those accounts at Signature Bank were emptied and/or closed by the Defendant within the prior two months, and Plaintiffs have not yet located the accounts through which Mr. Bronson now conducts his business.

   3. **Plaintiffs Learn that, While He Was Pretending to Settle This Case, Defendant Was Engaging in a Fire Sale of His Assets**

13. Plaintiffs also learned that, even as the Defendant was engaged in purported settlement of the Grober litigation, and as he was assiduously seeking to delay the entry of judgment, he was engaging in a veritable fire sale and transfer of his assets. For example, we learned that Mr. Bronson in February sold off a quantity of assets, transferring convertible notes and liquidating securities in a series of transactions with among others Beaufort Capital. A copy of the Beaufort Capital Partners, LLC documents are attached as Exhibit G.

### 4. Plaintiffs Learn That Defendant Resumed Using V2IP and Has His Wife Signing as "CEO"

14. We learned from former employees of Mr. Bronson that, during this part year, Bronson resumed using a particular company that he used during the period of Mr. Grober's employment, an entity called V2IP, Inc. ("V2IP"). As reflected in documents from that 2009 period, one of Mr. Bronson's entities, Fairhills Capital Group, engaged in transactions "through" V2IP. A copy of the Fairhills Capital Group documents are attached as Exhibit H.

15. During Mr. Grober's employment with Mr. Bronson in 2009, Mr. Grober saw Mr. Bronson conduct business through a number of entities, using his wife's or someone else's name. In fact, Mr. Bronson often bragged that he had placed assets, including a home valued at well in excess of a million dollars, in his wife's name to keep his assets out of reach. It was Mr. Grober's information, from Mr. Bronson and others, that Mr. Bronson had been investigated by and deemed a "bad actor" by the Securities and Exchange Commission ("SEC") and, as a result, used others as names and signatories on his own deals. Specifically, after he had issues with the SEC, he used Xcelerate Group, Deer Valley, Macallan, and V2IP, all entities with other signatories but all financed and entirely controlled by Mr. Bronson. The address used for all of those entities – including V2IP -- is that of Fairhills Capital, the office in White Plains from which Mr. Bronson (not Mrs. Bronson) operated. See Affidavit of Mark Grober ("Grober Aff."), attached hereto as Exhibit I.

16. Mr. Grober was aware during his employment with Mr. Bronson of a number of transactions that were done by Mr. Bronson in the name of V2IP. Those transactions that were done through V2IP did not involve any assets separate from the rest of Mr. Bronson's business. Grober Aff. ¶ 5. They did not involve Dawn Bronson; Mr. Bronson negotiated the terms of all of our deals. They did not even involve Dawn Bronson's signature. On more than one occasion,

Mr. Grober saw Mr. Bronson simply sign on the line above his wife's name with an indecipherable swoop like the one that appears on the Notice of Conversion relating to Safeguard Security Holdings. *Id.* and Exhibit A: Notice of Conversion. The transactions that involved trading in or sale of stock were also conducted by Mr. Bronson; Dawn Bronson never directed or even knew of any transaction or trading. Grober Aff. ¶ 5. Having worked closely with Mr. Bronson for an extended period of time, Mr. Grober understood that the V2IP entity was just another way that Mr. Bronson used to conceal his assets and avoid potential issues with regulators or creditors. *Id.*

17. Mr. Grober also met and dealt with Dawn Bronson on any number of occasions during his employment. *Id.* ¶ 6. She was a stay at home mother and was never involved in the securities business. *Id.* At one point she tried to convince Mr. Bronson to open some kind of a fitness club but that business failed. *Id.* After that, she decided to pursue swimwear design. *Id.* It was and remains Mr. Grober's information that Mr. Bronson's wife had no independent source of income. *Id.* All of their money came from Mr. Bronson's securities business and the funds used for the securities transactions were either derived from his business or obtained from people like Mr. Grober who made the mistake of participating in Mr. Bronson's investment activity. *Id.*

18. Mr. Bronson's recent use of V2IP apparently resulted from issues that developed regarding Macallan Partners. Mr. Grober recently learned from individuals who continued to work for Mr. Bronson that, during this year, Macallan Partners was essentially shut down by Alpine Securities, and he began to use the name V2IP again for his transactions. *Id.* ¶ 7. Those employees confirmed to Mr. Grober that the V2IP deals were business as usual: they were the same transactions, involving the acquisitions and sales of stock, that have always been Mr. Bronson's business. *Id.* The deals were originated, negotiated and conducted by him, all trading

was handled by him, and Dawn Bronson had no actual involvement in either the funds that were used for the transactions or the deals themselves. *Id.*

5. **Mr. Bronson's Use of Offshore Entities**

19. Mr. Bronson's use of entities like V2IP, placement of assets in his wife's name, and movement of funds to offshore accounts were all practices that were known to Mr. Grober. When Mr. Grober was still employed with him, Mr. Bronson established offshore accounts and began transferring money to them. He was still engaging in that pattern as of 2012: in just one month in 2012, Mr. Bronson received cash receipts of $1.6 million in the account of Fairhills Capital Offshore LP. Exhibit J: Wells Fargo Fairhills Capital Offshore LP Account Records at 5. In that same month, he also disbursed $1.6, more than $350,000 into an account held in the name of Edward and Dawn Bronson. *Id.* at 5 and 41-48.

20. Another "offshore" entity, Fairhills Capital Offshore Ltd., maintained an account at Deutsche Bank and, during the first three months of 2012, received more than $3 million. Ex. K: Fairhills Capital Offshore Ltd. Deutsche Bank Account at page 8.

6. **Bronson's Movement of Assets in 2016 Out of "His" Accounts and into "Hers"**

21. During the course of collection efforts – prior to Mr. Bronson's filing of this bankruptcy -- we were able to obtain a limited quantity of banking records. Even that limited quantity of records demonstrates that, until very recently, Macallan Partners had abundant assets totaling in excess of $1 million. Mr. Bronson, however, used these last few months to drain Macallan of all of its assets and transfer those assets and funds to Dawn Bronson, to V2IP, or to other unknown accounts or investments.

22. By way of example, during just a five month period, from January through May of this year, one of the Macallan Partners bank accounts deposited $710,273. Exhibit L:

7

Signature Bank account records of Macallan Partners LLC, ending 6325 at 92, 97-98, 106-07, 112-13 and 118-20. Another Macallan Partners account, ending 9780, had deposits of $63,465, for a total of more than $770,000. Exhibit M: Signature Bank Account Records of Macallan Partners LLC ending 9780 at 132 and 135. Those bank records indicate that Mr. Bronson disbursed a portion of those funds to acquire or engage in other investments in Hong Kong, Texas and elsewhere. Those investments were apparently not acquired in the name of Macallan since Mr. Bronson represents that the entire amount of more than $750,000 has been dissipated or lost and that Macallan's currents assets are $0.

23. Mr. Bronson also disbursed another significant portion of those funds to his wife and to V2IP. During the period January through September, the account of Dawn Bronson ending 9756 *received* deposits totaling more than $115,000. Exhibit N: Signature Bank Account Records of Dawn Bronson ending 9756 at 4, 6, 9, 12,-13, 18, 25, 32-33 and 40-41. Another Dawn Bronson V2IP bank account *received* $238,379. Exhibit O Signature Bank Account Records of V2IP ending 2358 at 150, 153, 159-60, 164, 167-68 and 172. The V2IP account also in August of 2016, disbursed $350,000 by check but we did not obtain the record identifying the recipient. *Id.* at 169. The joint account of Dawn and Edward Bronson received another $75,000. Exhibit P Signature Bank Account Records of Edward and Dawn Bronson ending in 2006 at 54, 59-60, 64-65 and 70.

24. Those bank records, on their face, contain only a piece of the Bronson's financial activity: money is moved in and out of other accounts for which we were not able to obtain records including accounts ending in 5697, 9799, 9845 and 2366. But even those records that we managed to obtain demonstrate that Mr. Bronson had and controls substantial assets that he liquidated and moved into this wife's name as he prepared to file this bankruptcy.

### 7. The Restraint of the Alpine Accounts

25. In October, Plaintiffs became aware of the possibility that Alpine Securities may be holding account(s) for defendant, whether in Defendant's name, Defendant's wife's name but for his benefit, or in the name of companies owned and controlled by Defendant or for his benefit.

26. On October 25, 2016, Alpine Securities confirmed to Plaintiffs that there are accounts at Alpine Securities in the name of Macallan Partners and V2IP in which assets are located.

27. On October 27, 2016, Plaintiffs appeared in New York Supreme Court before the Honorable Jeffrey Oing on Plaintiff's Order to Show Cause and Application for a Restraining Order. Judge Oing granted the application for a restraining order but scheduled the matter for the next day to allow Mr. Bronson an opportunity to provide further information to support his claim that the assets in one of the Alpine account, V2IP, belonged to his wife and should not be restrained.

28. On October 28, 2016, the parties appeared again before Judge Oing. Mr. Bronson produced a letter from Alpine Securities that confirmed that the V2IP account was in Dawn Bronson's name. That letter also stated, however, that trading authority over the account was held by Adam Didia. As reflected in documents provided to the Court as part of the Order to Show Cause, Mr. Didia works for Mr. Bronson, and is a Managing Manager of Mr. Bronson's entity, Macallan Partners. Based on all of the circumstances, including control of the account by Mr. Didia, Judge Oing continued the restraint of the V2IP assets.

29. Mr. Bronson filed this bankruptcy proceeding two days later. According to that filing, he has literally no assets except a gun, and his companies, including Fairhills Capital and Macallan Partners have assets of $0. Mr. Bronson does not list his home, or the assets of V2IP.

30. Also on October 31, 2016, the Debtor's counsel sent me an email stating that the "bankruptcy filing, therefore, renders void any state court order restraining Mr. Bronson's assets." In subsequent communications, I raised with Debtor's counsel the fact that Mr. Bronson specifically denied that the restrained V2IP account was his asset, and asked him for any authority supporting the view that his filing of bankruptcy would automatically vitiate the court's order. I made clear my concern that counsel's position "would have the effect of allowing Mr. Bronson to immediately dissipate assets that are the subject of a court order" precisely *because* Mr. Bronson claims that they are not part of the Debtor's estate.

31. Given those circumstances, I also communicated to Alpine my view that the restraint did not dissolve and again asked Mr. Rachmuth for any authority on the point.

Dated: November 10, 2016
New York, New York

*Maranda E. Fritz*
Maranda E. Fritz